DANIEK, J.
At the time when the proceedings in reference to the first division of the estate of William Carter deceased were had in the County court of Nottoway, the distribution of intestates’ estates was gov *478 erned by the act of 1785, which was re-enacted in 1792. The 27th section of the act provides, that “when any person shall die intestate as to his goods and chattels, or any part thereof, after funeral debts and just expenses paid, if there be no child, one moiety, or if there be a child or children, one-third, of the surplus shall go to the wife; but she shall have no more than the use, for her life, of such slaves as shall be in her share; and the residue of the surplus, and after the wife’s death, the slaves in her share, or, if there be no wife, then the whole of such surplus shall be distributed in the same proportions and to the same persons as lands are directed to descend in and by an act of assembly entitled ‘an act to reduce into one the several acts directing the course of descents.’ ”
And when any children of the intestate or their issue shall have received, from the intestate in his life time, any personal estate by way of advancement, and *shall choose to come into the distribution with the other persons entitled, such advancements shall be brought into hotchpot with the distributable surplus.
In the bill filed by the widow Jane Carter, and the distributees, (other than John H. Knight and wife,) it is alleged that Knight, in the lifetime of the intestate William Carter, intermarried with Sally EJ. Carter, one of the daughters of the said William, and was by him advanced to a full proportion of the personal estate of the intestate, and chooses not to bring the same into distribution, so that he is not entitled to any share in the said property. And Knight, who in his character of administrator of the intestate, is the only defendant made to the bill, (his wife being no party), in his answer, (which is styled the answer of John H. Knight, administrator of William Carter deceased,) says, that “he admits the allegations of the bill are correct, and hath no objection to the decree therein prayed for. ’ ’ The controversy, it is obvious, turns mainly on the legal extent and effect of Knight’s admission. And it is equally obvious, that the extent to which such admission ought to be construed as designed to bind him, and the legal effect of the admission on the rights of the parties in the controversy, must depend very much on the answer to be given to the question, What were the rights of the several parties in respect to Knight’s advancements at the time of the first division?
And first, in respect to the widow of the decedent. I do not think that the admission of Knight had or could have had any manner of bearing or influence on her rights. His consent or refusal to collate his advancements could not have affected the estate or funds out of which her thirds were to be allotted. Her share must have been the same, whether he elected to come into hotchpot at the first division or not. The question whether the widow has any interest in the Advancements which may be brought into the division, has never as yet, I believe, been decided by this court; but there is little doubt as to the propriety of an answer in the negative. The law which has been already cited, plainly marks out her share as being one-third of the surplus of the goods and chattels of the intestate, which shall be after funeral debts and just expenses paid: And in no legal sense can advancements, made by the decedent to his children in his lifetime, be said to constitute part of “his goods and chattels” as to which he died intestate. Such advancements are, to all intents, the property of the children to whom they have been made, and no longer the property of the parent who made them.
The propriety of this construction is, if possible, rendered still more manifest by a reference to previous legislation on the subject. The act for the distribution of in-testates’ estates, passed in 1748, 5 Hen. St. 444, provides that “one-third of the surplus of the personal estate (other than slaves) shall go to the wife,” and that “all the residue shall be distributed in equal proportion to and among the children of the intestate; and in case any such child or children be then dead, to such persons as legally represent them, other than such child or children who have had an3r estate settlement or portion from the intestate in his lifetime, equal in value to the share, arising by such distribution, to each of the other children : But if such estate settlement or portion be of less value than such child or children shall be entitled to, so much of the surplus aforesaid as shall make his, her or their share or shares equal to the share of each of the other children as near as can be estimated; and the heirs at law, notwithstanding any land he may have by descent or otherwise from the intestate, shall nevertheless have an equal part in the distribution with the rest of the children, without any consideration of the value of *the land.” The language employed in the act of 1705, “for the distribution of intestates’ estates,” 3 Hen. St. 371, in reference to the particulars under consideration, is of like import: And it is, I think, verj' clear that the provisions in both of said last mentioned acts, (those of 1748 and 1705,) in reference to the advancements, were made without any design to affect the widow’s share, and solely with the design of bringing about equalitj1- in the distributon of the surplus among the children of the intestate. And though the new provision in respect to the advancements, in the act of 1785, requiring the children who have been advanced to elect whether they will come into distribution, might, if read alone, create some doubt whether the advancements, when brought in, are not to form a part of the estate out of which the widow and children are all to take their shares, yet when we look to the preceding clause of the section under consideration, we find nothing there to denote a change of the policy observed in the previous laws, in respect to the widow’s rights. On the contrary, her rights are there clearly defined, and a manifest purpose is shown *479 to leave them wholly unaffected by the new regulation adopted for the purpose of equalizing the shares of the children.
The terms “the distributable surplus,” found in the last clause of the section, are, I think, identical in meaning with the terms “the residue of the surplus,” used in the first clause, in case there be a wife, and with the terms ‘ ‘the whole of such surplus, ” if there be no wife, of the intestate; and the words “other persons entitled,” employed in the last clause, serve to designate the same persons that are described in the first, by the terms “to the same persons that lands are directed to descend, ’ ’ &c., to wit: the children of the intestate, if any: and have no reference to the wife.
This rule, denying to the widow any interest in the 'x'property advanced to the children, prevails in England under the construction given to her statute of distributions; Kircudbright v. Kircudbright, 8 Ves. R. 51; and has been adopted in Massachusetts, Tennessee, Alabama, Georgia and South Carolina; and also, I believe, in other states of the Union. Stearns v. Stearns, 1 Pick. R. 157; Brunson v. Brunson, Meigs’ R. 360; Logan v. Logan, 13 Alab. R. 653; 15 Id. 85; Beavers v. Winn, 9 Georgia R. 187; Ex parte Lawton, 3 Dess. R. 199.
The language employed in the South Carolina act is very similar to that used in our act of 1785; and the reasoning of the chancellor in the case last cited, bears with full force on the question under consideration. After reciting the act of his state, he says, “the effect of the provision is to equalize all the children of the testator by diminishing the quantity of property to be given to a child who has been advanced by the parent, exactly so much as has been given him in advance.” — “The widow is to take a third of whatever estate the intestate is possessed of, interested in, or entitled to, at the time of his death, and no more or other estate; nor does the first recited clause, making provision for the case of children who had been advanced, have any relation to the widow: that was intended merely as a rule of equalization among the children. The widow is to take, in all events, a third of what is left, and the children the remaining two-thirds. The proportion in which the children take those two-thirds is of no importance to the widow; but it is of importance to natural justice, legitimated by our act of assembly, that the children should receive equal portions of the parents’ property. Hence the necessity of a rule for the division of the two-thirds part of the intestate’s estate, intended for the children, which should prevent those who have been advanced, receiving as much of the two-thirds as those who have not been advanced: And the clause *of the act regulating this point and furnishing the rule, expressljr confines its provisions to the children, and says nothing of the share of the widow which had been definitively fixed by the preceding clause.”
The reasoning of the Supreme court of Georgia in the case of Beavers v. Winn & others, cited above, seems equally applicable to questions arising under our act. “The estate (says the court) subject to distribution is the property belonging to the decedent at his death. A gift of property to a child as effectually passes the title out of the parent as any other mode of alienation. An advance, that is, a transfer of property to a child, divests the parent and invests the child with the title. The property is no longer in the father. It is no part of his estate whilst he lives. He cannot revoke the title, if he would. The property belongs to the child, and is subject to his debt. The widow being entitled to share equally in the estate of the decedent only, by what right does she claim an interest in the advancement? As well might she claim an interest in the property of the advanced child, acquired by purchase. This view is strongly fortified by the fact, that under no law is the advanced child compellable to bring the portion given to him back into the common stock, even at the instance of children. Whatever he has got, whether less or more than his proportion of the estate, he can keep. It is his own. If less, of course he would bring it back, for by so doing only can he get his full share by the law of hotchpot. If he chooses though not to do so against his interest, he has the right so not to do.” “It would seem that if the widow is entitled to share in advancements made to children, children ought to be entitled to share in settlements made upon the wife during coverture: The rights of the parties ought to be reciprocal. But settlements made upon the wife during the coverture are no part of the estate.” And for any apparent injustice done to the widow by leaving *her no interest in the advancements, (the opinion proceeds to show,) compensation is made by allowing her to hold on to any settlements which may have been made in her favor.
These views of the rights of the widow of the intestate show that she had no manner of concern in Knight’s choosing or declining to come into hotchpot in the division of 1818; and the allegations of the bill and admissions of the answer in respect to his advancements, and to his electing not to come into the division, were, consequently, so far as Mrs. Carter was concerned, wholly foreign to the object contemplated by the proceedings then had.
Let us next enquire whether or no the children had a right in such a, bill as that filed in 1818, to insist that Knight should then make his election, in order to entitle him to an interest, or rather to preserve the interest which he then had in the remainder or reversion, after the life of the widow, in the slaves allotted to her share.
The statute plainly contemplates two allotments and distributions in such a case as we have here. The words of the statute, as before cited, are “the residue of the surplus, and after the wife’s death, the slaves in her share, or if there be no wife, then *480 the whole of the surplus shall be distributed,” &c.
If there be no wife, there is to be but one distribution, and that is of the whole of the surplus, after the payment of debts, &c. If there be a wife, the residue, after taking out her share, is to be distributed presently, and the slaves in her share are to be distributed after her death.
The persons entitled to distribution might, in a case of the kind, no doubt, by consent, settle and adjust all their interests in the property, present and prospective, by one proceeding — one allotment and division. They might fix, by estimate, upon the present *value of the reversion in each slave in- the widow’s share, and agree each to hold in severalty a reversionary right in a particular slave or parcel of slaves, (and the increase if any,) and thus anticipate, and dispense with the necessity of any farther proceedings for a division at the death of the widow. But an allotment or division of this kind is not the “distribution” contemplated by the statute. Certainty no such allotment was sought by the parties or decreed by the court in the friendly suit of 1818. The parties sought, and the court decreed the allotment and distribution only of that portion of the surplus, the possession whereof might be then taken, and presently enjoyed, by the respective distributees, leaving the slaves in the widow’s share for allotment and distribution, at her death, among those entitled.
It not unfrequentty happens that the administrator, at the time of the division, is ready to close his administration; and in such cases he is allowed to hand over, for distribution, bonds, notes and other evidences of debt belonging to the estate, whether they are then payable or not; which are at once distributed; but I apprehend that no practice ever coúld have obtained, in such proceedings, of allotting among the children, in severalty, as part of their lots or shares, the reversionary right to the slaves in the widow’s share, or of treating such right as a subject to be valued on for the purpose of producing equality in the distribution. That equality is brought about in a manner wholly different. If the subjects to be distributed are-not so divisible as to be susceptible of severance into parcels exactly equal in value, the distrib-utees, whose lots exceed in value their due proportions, pay over the excess to those whose lots fall short of that proportion.
To compel a child, then, whose advancements exceed his share in the property to be divided fit the first distribution, but do not equal his share in the *whole, including the slaves in the widow’s share, to bring in such advancements at such distribution, as the condition of keeping alive his right to participate in the distribution of the slavfes at the widow’s death, is to force him to pay presently for an undivided interest in á subject, the distribution of which is postponed to an uncertain, and in all probability a distant day.' Such a requirement would seem to be at war with the nature of that bringing together into hotchpot and distribution, of the estate of the intestate, advancements of the children, usually contemplated and effected by such proceedings as those had in the suit of 1818. The prominent idea suggested by a going into hotchpot, is that of a collation and division of subjects susceptible of immediate distribution among those entitled, and not that of an ascertainment or adjudication of the mere rights of the parties to property which does not then admit of such distribution. And an advance child, made a defendant to such a suit as that of 1818, might well suppose that the only effect of his declining to carry his advancements into the collation, would be to debar him of any participation in the distribution then to be had, and not to deprive him of a right thereafter to claim his interest in an estate which, from its very nature, was not then ready for distribution.
I do not wish to be understood as intimating that in no case can an advanced child be compelled to elect, in anticipation, whether or no he will carry in his advancements as the condition of acquiring or preserving an interest in a reversion. I can readily conceive how it might be of great importance to the other children, or some of them, to have the precise extent of their several interests in such a reversion ascertained and defined. Their wants or comforts might require that they should realize the value of their éstate by a sale, which could not be judiciously made so long as doubt *and uncertainty existed as to the number of persons entitled to the reversion. I do not mean to sajr that, in such a state of things, upon a bill filed containing the proper allegations and setting forth distinctly the objects of the suit, a court of equity might not compel an advanced child to elect whether he would hold on to his advancements, or bring them in, and claim his interest in the reversion. But in such a case the court, I presume, would not proceed to a decree without first taking the steps proper to be observed, and affording opportunity for the exhibition of the data proper to be considered, in making up an estimate of the probable value of the reversion, unless otherwise satisfied that the defendant was prepared to act understandingly and deliberately in making his election.
On the other hand, cases may be supposed in which it would seem to be manifestly harsh and unjust to the advanced child to constrain his election by proceedings however regular. As in the case of an intestate dying, leaving property of trifling value in possession, but a claim to a large estate in suit. Would a court of equity, in such a state of things, force upon a child, who had received an advancement in the lifetime of the intestate, more than equal to his proportion of the property at present to be distributed, the alternative either of paying down the excess as the price of an interest in a suit which may result in *481 nothing, or of abandoning such interest, and thereby losing what may turn out to be a fortune? I should think not. Sales of expectant and uncertain interests are watched with jealousy by courts of equity; and trifling circumstances, added to inadequacy of price, have, in many cases, been held sufficient to vacate them: And how, in principle and result, would the choice, by the advanced child, of the latter alternative, in the case just supposed, differ from such a sale? He might be giving away a large ^patrimony for the privilege of retaining an advantage or benefit comparatively insignificant in value. In forcing a child into such an election, a court of equity would (it seems to me) be departing from one of its wisest rules, and giving encouragement to a species of speculation which it has hitherto shown the greatest anxiety to discountenance and restrain.
The law of hotchpot, as I understand it, does not call for or sanction such a departure. It is founded in sentiments of natural justice and equity, and proposes for its end exact equality of benefit among those who stand in the same degrees of relationship to the persons over the distribution of whose estates it takes control. It prescribes the rules for equalizing the distribution of property susceptible of distribution, and does not (except in special cases) contemplate the valuation and adjustment of contingent, uncertain or expectant interests.
These views have led my mind to the conclusion that Knight and wife were not debarred by the division of 1818 from a right to participate in that of 1852. The allegations of the bill and the admissions of the answer in the suit of 1818 are sufficiently broad to embrace the interests of the parties in the whole personal estate of the intestate, as well that then ready for distribution as that allotted to the widow’s share; but looking to the rights of the several parties and to the objects most probabl5r contemplated by them, I think that their allegations and admissions in respect to Knight’s advancements, and his choosing not to bring the same into distribution, ought to be construed as referring to the two-thirds of the surplus then to be distributed, and not as extending also to the slaves in the widow’s share.
The question is one of the first impression. In England the institution of slavery does not exist, and there the share which the wife takes in the personal ^'estate of her deceased husband, in case of his intestacy, is absolute. No precedent, therefore, for governing such a case as this can be derived from that source. The same may be said of many of our sister states; and in none of the slaveholding states, where laws, in relation to the subject, similar to our own, prevail, does the question appear to have been yet decided. In the absence of authority, I have felt free to adopt that rule which seemed to me to be the most likely to attain the equitable end proposed by our statute. ,
It was urged at the bar that such a construction of the law gives to an advanced child an undue advantage over the other children. That in all cases of the kind the advanced children, if their advancements exceeded their shares of the surplus to be distributed in the first division, would hold off and await the termination of the life estate. If the slaves had increased in the meantime so as to make it to their interest to bring in their advancements and claim a share, they would do so; if not, they would hold on to their advancements. That the advanced children would thus stand in a condition of perfect safety, whilst the others might sustain loss by a diminution in the value of the slaves. To this it was answered that the advanced children acquired this advantage by the gift of their parent in his lifetime, who had a right, if so disposed, to have given them his whole estate in exclusion of the other children; and that the like hardship (if hardship it be) may occur in any case of intestacy where there are advanced children, whether there be several distributions of the intestate’s property, or only one. For if there be but one division, still till that division is had, the advanced children hold their advancements, no matter how long it may have been since they received them. If the residue of the property which the intestate kept in his hands, has swelled in the interval, *into a large estate, they may carry in their advancements and claim their shares. If, on the other hand, it has dwindled away so as to be of little or no value, they may refuse to go into the division ; and thus retain their advancements, without giving any just cause of complaint to the other children.
Cases may be supposed, where, from the very nature and condition of the estate left by the intestate, the advanced children might continue lawfully to hold this position of supposed advantage for a long period after the death of the intestate; as where the only property or right of property left by him is a suit, or where his whole estate consists of a remainder or reversion after the expiration of a particular estate which at his death had not determined. And I do not see how the argument founded on the supposed undue advantage in favor of the advanced children, applies with any greater force to the position which they occupy in respect to the slaves in the widow’s share, than it does to that which they would hold, in the cases just put, in reference to the uncertain or expectant interests there mentioned.
And if considerations of possible hardship to the unadvanced children, growing out of the construction which I would give to the law, still present themselves as objections to its adoption, it seems to me they are greatly overweighed by views of the manifest injustice to the advanced child, which might be done, under the working of the opposite construction. Under the first mentioned construction, the unadvanced children could in no state of things be de *482 prived of their equal shares in the estate left by the intestate undisposed of. In case the advanced children should elect not to go into hotchpot at the last division, the other children would get the whole estate left by the intestate. If the advanced children, on the other hand, should go into the division, then the other children *would get their equal shares not only of the estate left, but also of that advanced in his lifetime, by the intestate. In no case are the unadvanced children exposed to the great hazards which must be encountered by the advanced children, and which may, in some cases, as we have shown, eventuate in the loss to them of interests of great value, if they are forced into speculative elections respecting uncertain, contingent or expectant estates.
A serious objection to forcing an advanced child into an election respecting such interests, is to be found in the consideration that his pecuniary condition might be such as to forbid his making a free, even if he could make an intelligent and well informed election in the matter. He might, from his straightened circumstances, be wholly unable to pay, presently, the excess of his advancement over and above his share of the property about to be distributed, and would thus be constrained, by necessity, and not by the election and choice of his judgment, to forego the acquisition or preservation of that which, if left free to choose, he would regard and elect to take as an interest of great prospective value.
Upon the whole, without any particular consideration of the question discussed at the bar, whether a married woman, who is no party to the proceedings, could be bound by the election of her husband in respect to her reversionary interest in the slaves in the widow’s share, (the decision of that question being, in the view I take of the case, unnecessary,) I think that the court erred in its decree of September 1852, in excluding Knight and wife from a participation in the division of the slaves in Mrs. Carter’s share; and in decreeing the proceeds of the slaves in the lot assigned to the appellants by the commissioners, to be distributed among the appellees. It also seems to me that Knight and wife have, by *their answer to the bill in the suit of 1818, precluded themselves from any right to show that their advancements were not equal in value to the shares of the other children respectively in the surplus then distributed. And as testimony has been taken on both sides in respect to said advancements, and has not resulted, as it seems to me, in proving that they were of greater value than the shares of the other children in said surplus, the errors of the Circuit court would, in my view, be corrected simply by reversing so much of the decree of September 1852 as decrees the proceeds of the slaves allotted to the appellants by the commissioners to be distributed among the appellees, and decreeing the same to be paid to the appellants. But whilst a majority of the court concur with me in holding that Knight and wife ought not to be excluded from participating in the division of the slaves in Mrs. Carter’s share, they are also of opinion that the other children are entitled (if any of them so desire) to have an account of Knight’s advancements; and that the cause should be remanded, wifh liberty to the appellees to call for such an account, and to show, if they can, that Knight’s advancements exceeded in value the shares distributed to the other children respectively in the division of 1818. That in stating the account, Knight should be charged with his advancements as of the date of the death of the intestate, and with interest thereon from said date to that of the division in 1818. And if the aggregate of said advancements and interest are found to exceed the value of the shares aforesaid respectively, such excess, together with interest thereon from the last mentioned date to the first of January 1852, the date of the decree for the division of the slaves in Mrs. Carter’s share, should be charged to the appellants, as the advancement to be accounted for before receiving any share in the proceeds of said slaves. But that *if on taking said account it should result in showing that Knight’s advancements do not exceed in value the shares allotted to the other children in the division of 1818, or if no such account be called for, then the Circuit court should decree the proceeds of the slaves allotted to Knight and wife by the commissioners under the decree of January 1852 to be paid to them. And the decree which I have prepared is in accordance with the last mentioned opinion.
BEE, J., concurred in the results of the opinion of Judge Daniel; and also in the reasoning upon the question of postponing the election, as applied to slaves allotted to the widow.
MONCURE, J., concurred . in the results of the opinion and in most of the reasoning, on the ground of the peculiar nature of slave property. He thought an advanced child might postpone his election until th.e division of the dower slaves. He was rather inclined to think that in the case stated by Judge Daniel by way of illustration, the advanced child would not be entitled to postpone his election.
ALLEN, P., concurred in the results of the opinion, and also in the reasoning, except the case stated as an illustration; and was rather inclined to think that correct.
SAMUELS, J., dissented. He was for affirming the decree.
The decree was as follows:
It seems to the court, that the appellants ought not to be estopped by the answer of the male appellant, tiled in the suit brought by Jane Carter, Lyddall Bacon and others, in the' County court of Notto-way, *in January 1818, or by any other matter appearing in the cause, from participating in the distribution of the slaves assigned and allotted to Mrs. Carter in said suit, as her third part of the slaves of her deceased husband William Carter; and consequently that so much of the decree *483 of the 5th of October 1852, as decides that they are not entitled to such participation, and decrees the proceeds of the slaves allotted to the appellants by the commissioners in pursuance of the interlocutory order of the 1st of January 1852, is erroneous; and the said decree is reversed in said particulars, and affirmed as to the residue, with costs.
And it seeming- further to the court, that before passing finally on the rights of the parties it would be right to allow the ap-pellees to have an account of advancements made by the intestate William Carter in his lifetime, to the appellant Knight, if they or any of them shall so desire, and that whilst Knight, by his answer in the suit of 1818, before mentioned, has estopped himself from showing that such advancements are not equal in value to the respective shares received by the distributees in said suit, the appellees ought yet to be allowed to show, if they can, that said advancements were of greater value, the cause is remanded for further proceedings. And liberty is given to the appellees or either of them, to call for said account, and to show before the commissioners by any competent proofs, the value of said advancements.
In stating said account, the appellants are to be charged with said advancements as of the date of the death of the intestate, with interest thereon to the 1st of January, the date of the filing of the bill in the suit for a division in the County court of Notto-way, before mentioned ; and if the aggregate of said advancements and interest shall be found to exceed in value the respective shares allotted to the '^distributees in said division, then such excess, together with interest thereon from the said 1st January 1818 to the 1st of January 1852, the date of the filing of the bill in this cause, is to be treated as the amount of advancements with which the appellants are to be charged before receiving, as distribu-tees of the intestate, any part of the proceeds of the slaves allotted to them by the commissioners, in pursuance of the interlocutory order of the last mentioned date. If, however, on taking said account, it is made to appear that the advancements stated on the principles above indicated, did not, in January 1818, exceed the shares received by the distributees respectively, in the division aforesaid of that date; or if said account is not called for, the Circuit court is to render a decree in favor of the appellants for the proceeds of the slaves aforesaid, allotted to them by the commissioners as aforesaid.